******************************************************

    The "officially released" date that appears near the be-
ginning of each opinion is the date the opinion will be pub-
lished in the Connecticut Law Journal or the date it was
released as a slip opinion. The operative date for the be-
ginning of all time periods for filing postopinion motions
and petitions for certification is the "officially released"
date appearing in the opinion.

    All opinions are subject to modification and technical
correction prior to official publication in the Connecticut
Reports and Connecticut Appellate Reports. In the event of
discrepancies between the advance release version of an
opinion and the latest version appearing in the Connecticut
Law Journal and subsequently in the Connecticut Reports
or Connecticut Appellate Reports, the latest version is to
be considered authoritative.

    The syllabus and procedural history accompanying the
opinion as it appears in the Connecticut Law Journal and
bound volumes of official reports are copyrighted by the
Secretary of the State, State of Connecticut, and may not
be reproduced and distributed without the express written
permission of the Commission on Official Legal Publica-
tions, Judicial Branch, State of Connecticut.
******************************************************

# STATE OF CONNECTICUT *v.* VINCENTE AYALA
## (SC 19888)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

Convicted of the crimes of murder and conspiracy to commit murder in connection with the shooting death of the victim, the defendant appealed to this court, claiming that the trial court had improperly admitted certain testimony. At trial, the state introduced evidence indicating that the defendant and the victim had been members of a particular street gang and that the victim, prior to being murdered, was planning to leave that gang to join another gang. T, another gang member, testified that a gang leader, after learning about the victim's intent to leave the gang, ordered T to kill the victim and that, when T refused, the defendant volunteered to do so. Another member of the gang, R, testified that he had been in the victim's vehicle with, among others, the gang leader, the defendant, and the victim on the night of the victim's death. R testified that he had heard a gunshot shortly after leaving the vehicle and that, about one-half hour later, the defendant admitted to him that he had killed the victim. R testified that he then went back to the vehicle and saw the victim's lifeless body. R also testified that, a few days later, the gang leader told him that the defendant had killed the victim at his direction. In addition, T testified that he had told the victim prior to the murder about the threat to the victim's life and that the defendant had later expressed remorse to T for having killed the victim. Another witness, W further testified that the victim had made statements to him on the night of the murder in which the victim expressed fear of the gang. The defendant moved to preclude R's testimony regarding the statement made by the gang leader to R that the defendant had killed the victim at the gang leader's direction and W's testimony regarding the victim's fear of the gang. The trial court denied the defendant's motions, concluding, inter alia, that R's testimony regarding the gang leader's statement to him was admissible under the hearsay exception for statements made by a coconspirator and that W's testimony was relevant evidence of the victim's state of mind. On appeal from the judgment of conviction, *held*:

1. This court declined to address the substance of the defendant's claim that the trial court improperly had admitted R's testimony regarding the gang leader's statement to R that the defendant had killed the victim at the gang leader's direction because, even if the admission of that testimony was improper, the defendant failed to meet his burden of demonstrating harm; even if the trial court improperly admitted that portion of R's testimony under the coconspirator exception to the hearsay rule, this court had a fair assurance that the admission of the challenged testimony did not substantially affect the verdict because it was not highlighted in the state's closing argument and was largely cumulative of, and corroborated by, other evidence presented by the state at trial, including the defendant's own admissions to R and T that he killed the victim, R's testimony regarding his observation of the victim's body in the car immediately after the defendant admitted to R that he had killed the victim, and T's testimony that the defendant had volunteered to kill the victim and had expressed remorse for having done so.

   (*Three justices dissenting in one opinion*)

2. The trial court did not abuse its discretion in determining that the victim's state of mind with respect to his fear of the gang was relevant evidence of the deteriorating nature of the victim's relationship with the gang, from which the jury could reasonably infer the defendant's motive to kill the victim and also in determining that the admission of W's testimony regarding the victim's statements of fear was not unduly prejudicial; the victim's statements to W that he feared the gang provided a sufficient link to the defendant to warrant the admissibility of W's testimony, and independent, corroborating evidence, including testimony regarding the circumstances surrounding the gang leader's order, the defendant's

agreement to follow that order, and the victim's knowledge of the threat made on his life, allowed the jury to infer motive from the victim's expression of fear without resorting to impermissible speculation.

Argued September 20, 2018—officially released September 24, 2019

*Procedural History*

Substitute information charging the defendant with the crimes of murder, conspiracy to commit murder, criminal possession of a firearm and carrying a pistol without a permit, brought to the Superior Court in the judicial district of New Haven, where the court, *Alander, J.*, denied the defendant's motion in limine; thereafter, the charges of murder and conspiracy to commit murder were tried to the jury before *Alander, J.*; verdict of guilty; subsequently, the defendant was tried to the court, *Alander, J.*, on the charges of criminal possession of a firearm and carrying a pistol without a permit; finding of not guilty; thereafter, the court, *Alander, J.*, denied the defendant's motion for a new trial and rendered judgment of guilty in accordance with the verdict and the finding, from which the defendant appealed to this court. *Affirmed.*

*Christopher Y. Duby*, assigned counsel, with whom, on the brief, was *Robert L. O'Brien*, assigned counsel, for the appellant (defendant).

*Linda F. Currie-Zeffiro*, assistant state's attorney, with whom were *John P. Doyle, Jr.*, senior assistant state's attorney, and, on the brief, *Patrick J. Griffin*, state's attorney, for the appellee (state).

*Opinion*

MULLINS, J. This appeal arises from a judgment of conviction against the defendant, Vincente Ayala, on the charges of murder in violation of General Statutes § 53a-54a and conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a.[1] On appeal, the defendant raises two evidentiary claims.[2] First, he claims that the trial court improperly admitted testimony implicating him in the murder under the coconspirator exception to the hearsay rule. Second, he claims that the trial court improperly admitted certain state of mind evidence. We disagree with both claims and, accordingly, affirm the judgment of the trial court.

The record reveals the following facts, which the jury reasonably could have found, and procedural history. The victim, Thomas L. Mozell, Jr., and the defendant were members of Piru, a nationwide street gang affiliated with the Bloods that has a local presence in New Haven. An individual known as "Terror," a gang leader, believed that the victim had disrespected the gang. In particular, Terror and the members of Piru believed that the victim was planning to leave Piru to join a different gang and that he would retaliate against them once he left. As a result, in a meeting that included Terror, Timothy Thomas, the defendant, and several other gang members, Terror ordered Thomas, as the "hood enforcer" of the gang, to kill the victim.[3] Thomas refused, however, because he was close friends with the victim. At that point, the defendant volunteered to carry out Terror's order to kill the victim. Later that day, Thomas spoke to the victim and warned him of the threat the gang now posed to his life.

Not long after the meeting, the defendant carried out Terror's order by shooting the victim in the head while he, Terror, and several other gang members were smoking marijuana inside of the victim's vehicle. Thirty minutes after the shooting, the defendant admitted to another gang member, Jordan Richard,[4] that he had shot the victim.

The next day, the police found the victim dead in his vehicle with a fatal gunshot wound to his head. Also on the day following the murder, the defendant told Thomas that he felt badly about what he had to do but that Terror had ordered him to kill the victim.

Following the defendant's arrest and a weeklong trial, the jury returned a verdict of guilty on charges of murder and conspiracy to commit murder. The trial court rendered judgment in accordance with the jury's verdict and imposed a total effective sentence of 55 years of incarceration. This appeal followed.[5] Additional relevant facts will be set forth as necessary.

I

The defendant first claims that the trial court incor-

rectly admitted certain testimony from Richard under the coconspirator exception to the hearsay rule. This claim relates specifically to Richard's testimony that, several days after the murder, Terror told him that the defendant had killed the victim at Terror's direction. The defendant contends that this testimony does not fall within the coconspirator exception because there was insufficient evidence that (1) a conspiracy existed between Terror and the defendant at the time Terror made those statements, and (2) Terror made the statements in furtherance of the conspiracy.

The state counters that the trial court properly admitted Richard's testimony pursuant to the coconspirator exception. The state argues that Terror's statements were made during, and in furtherance of, the conspiracy because, notwithstanding the fact that the murder had occurred several days before Terror relayed the details to Richard, the conspiracy still was ongoing. The state further claims that Terror's statements were made in furtherance of the conspiracy because they embroiled Richard deeper into the conspiracy in order to prevent him from going to the police. The state also contends that, even if the trial court improperly admitted Richard's testimony regarding Terror's statements, any error was harmless. We agree with the state's latter contention and, therefore, do not address the substance of the defendant's evidentiary claims regarding the coconspirator exception. Specifically, we conclude that any error in admitting the testimony under the coconspirator exception to the hearsay rule was harmless.

The following additional facts and procedural history are relevant to our resolution of this claim. Prior to the start of the second day of trial, the defendant filed a motion in limine in anticipation of the state's calling Richard as a witness. The defendant sought to preclude Richard's testimony regarding statements made to Richard by Terror detailing the killing, including how the defendant shot the victim. The trial court heard argument by counsel. Relying on evidence that already had been presented at trial and on the state's representations of Richard's expected testimony, the court determined that the state had established, by a preponderance of the evidence, the requirements for admission under the coconspirator exception. The court, therefore, denied the motion and allowed Richard to testify regarding Terror's statements.

Richard testified as follows at trial. On the evening of the murder, he and other members of Piru were at the house of fellow gang member, Davon Youmans, when he saw Youmans hand Terror a .40 caliber handgun. Terror put the gun in his waistband. Shortly thereafter, Terror, the victim, Richard and another gang member, Montese Gilliams, went to smoke marijuana in the victim's vehicle, which was parked just down the street from Youmans' house. Richard testified that they

got into the victim's car and that the victim sat in the driver's seat, Gilliams sat in the front passenger seat, Terror sat behind the victim, and Richard sat behind Gilliams. They soon were joined by the defendant at which point Richard moved to the rear middle seat and the defendant sat behind Gilliams on the passenger side of the car. The others then told Richard to get out of the vehicle. Obeying those orders, Richard got out of the vehicle and went back to Youmans' house where he began playing cards. About twenty minutes later, Richard heard a gunshot. He remained inside the house playing cards.

About thirty minutes after Richard heard the gunshot, the defendant came inside Youmans' house wearing different clothes and acting cocky and arrogant. The defendant then told Richard that he had shot the victim. At first, Richard did not believe him, so the defendant told Richard to "go see for yourself." Richard then went back to the victim's vehicle, got inside the vehicle and saw the victim's lifeless body.

Richard also testified that, a couple of days later, Terror asked Richard to accompany him to New York City. He went with Terror and stayed there for five or six days. It was during this time in New York City that Terror made the statement to Richard that is at issue in this appeal. In particular, Terror reportedly said that he, the defendant, and the victim had been inside of the victim's vehicle, he had handed the gun to the defendant, he had looked over at the defendant, and the defendant then shot the victim. The defendant asserts that it was error for the trial court to admit this statement under the coconspirator exception to the hearsay rule because Terror made the statement days after the murder occurred and the conspiracy had ended. As a result, the defendant argues, the statement could not have been made in furtherance of a conspiracy. The defendant further argues that this evidentiary error was harmful.

We assume, without deciding, that it was improper for the trial court to admit Richard's testimony regarding Terror's statements under the coconspirator exception to the hearsay rule. Nevertheless, we conclude that the defendant has failed to meet his burden of establishing harm under the circumstances of this case.

"When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [W]hether [an improper ruling] is harmless in a particular case depends upon a number of factors, such as the importance of the . . . testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

. . . Most importantly, we must examine the impact of the . . . evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State v. Bouknight*, 323 Conn. 620, 626–27, 149 A.3d 975 (2016).

As the harmless error standard requires, we must examine the impact that the challenged statements had on the jury and the result of the trial. Our review of the evidence assures us that this evidence did not substantially sway the jury. To be sure, although Richard's testimony was generally important to the state's case, particularly in light of limited physical evidence, the specific statement at issue was largely cumulative of other evidence and also corroborated by other evidence on material points.

Indeed, perhaps the most significant evidence was the defendant's own admission. Richard testified that, on the night of the murder, he heard a gunshot shortly after he left the victim's vehicle. Thirty minutes later, the defendant admitted to Richard that he had just shot the victim. The defendant then told Richard to go back to the vehicle. When Richard did, he saw the victim's dead body with a gunshot wound, which was consistent with how the defendant had admitted to killing him. The police also found the victim dead in his vehicle from a gunshot wound the next day. Forensic evidence revealed that the victim was shot behind his right ear, which was consistent with Richard's testimony regarding the fact that the defendant was sitting in the rear of the vehicle on the passenger side of the car. Thus, Terror's statement that the defendant was the person who killed the victim was cumulative of Richard's other, unchallenged testimony that the defendant had admitted to killing the victim.

Additionally, testimony from another Piru gang member, Thomas, also corroborated the challenged testimony. Thomas testified that Terror and other gang members had held a meeting to address what to do with the victim, whom they believed betrayed the gang, and that Terror had ordered him to kill the victim. After Thomas refused to comply with Terror's order, the defendant volunteered to kill the victim. This testimony clearly demonstrates both the defendant's agreement to be part of the conspiracy and his intent to commit the murder. Thomas further testified that, during a conversation with the defendant about the victim on the day after the murder, the defendant told him that he felt badly about what he had to do but that Terror had ordered him to kill the victim.

Although this was not an ironclad case, it certainly was sufficiently strong, even without considering the challenged testimony, so that we have a fair assurance that admission of the challenged statements did not substantially affect the verdict. Indeed, two separate witnesses implicated the defendant as the killer, and, notably, one of them testified that the defendant had confessed to the crime minutes after he committed it. The other witness testified that the defendant, after killing the victim, said that he felt remorse for having done so. This remorse further established the defendant's own acknowledgment of his involvement in the killing. The evidence also showed that the defendant was sitting in the rear of the vehicle on the passenger side and that the victim was shot behind his right ear. Therefore, this physical evidence demonstrated that the person who shot the victim was sitting in the seat in which the defendant sat. Thus, on the material points of whether the defendant committed the murder, Richard's testimony about Terror's statement was corroborated by other evidence.[6]

The defendant claims that Terror's statement was not corroborated by, or cumulative of, other evidence introduced by the state because the statement was the only evidence that described exactly *how* the murder occurred inside the victim's car. He argues that the remainder of Richard's testimony and the testimony of Thomas only described the fact that the murder occurred, not how it happened. We are unpersuaded by the defendant's argument.

As we already have explained, the defendant's agreement with Terror to commit the murder and the defendant's subsequent commission of that murder were already established by Thomas' testimony and Richard's other testimony. In this case, the precise details of how the murder occurred were not necessary to establishing either the identity of the killer or the elements of the crimes charged. Notwithstanding the dissent's wholesale attack on hearsay evidence in general, the defendant's admissions were competent, unchallenged evidence before the jury. The challenged statements added very little, and, thus, we do not believe that the jury's verdict was substantially swayed by their admission. The other evidence already had established that the defendant had volunteered to kill the victim, had admitted to shooting the victim inside the victim's vehicle, and that the victim had been discovered by the police in his vehicle, dead from a gunshot wound. Certainly, on this record, even without Terror's statement that he handed the gun to the defendant inside the car, the identity of the killer and all of the elements of murder and conspiracy to commit murder were established.[7] We think it significant in evaluating harm to look to see how the state used this evidence in its closing argument. In doing so, we find it telling that the state did

not specifically mention, and certainly did not empha-size, the challenged statement during its closing argu-ment, thus diminishing the importance of the statement to the state's case.[8] See *State* v. *Thompson*, 266 Conn. 440, 456, 832 A.2d 626 (2003) (concluding that admission of challenged testimony was harmless error, in part, because state did not emphasize or rely on challenged testimony during closing argument). Rather, the state focused its argument on the other unchallenged evi-dence highlighted in this opinion. Stated succinctly, Terror's statement simply was not pivotal to the state's case.

The defendant also claims that the admission of Ter-ror's statement was harmful because the state's case was weak.[9] In support of his claim, the defendant points to a lack of physical evidence connecting him to the murder. It is well established, however, that a lack of physical evidence does not necessarily equate to a weak case. See *State* v. *Fauci*, 282 Conn. 23, 53, 917 A.2d 978 (2007) (concluding that state's case was strong on basis of witness testimony despite lack of physical evidence linking defendant to crime). In the present case, although we acknowledge that there was no physical evidence linking the defendant to the murder and that physical evidence providing that link would have made the state's case stronger, the unchallenged testimonial evidence of Richard and Thomas demonstrated that the defendant agreed to kill the victim and later admitted to doing the same.

The defendant asserts that Richard's testimony was the only testimony that the jury believed, so any part of it that was improperly admitted could not be harm-less. In support of his claim, the defendant points to the fact that Richard's testimony and Thomas' testimony conflicted on the issue of whether the defendant was present at the meeting where he allegedly volunteered to kill the victim. As a result, the defendant claims that the jury had to believe either Richard's testimony in its entirety or Thomas' testimony in its entirety, but it could not believe both.[10] The defendant further reasons that, because the jury asked to have Richard's testimony read back but did not ask to have Thomas' testimony read back, it must have believed Richard's testimony in its entirety and rejected Thomas' testimony in its entirety.

Contrary to the defendant's contention, it is not accu-rate that the jury had only two choices: either entirely believe Richard or entirely believe Thomas. The jury did not have to believe either Richard's testimony or Thomas' testimony in its entirety. In fact, this court repeatedly has explained that "[i]t is the exclusive prov-ince of the trier of fact to weigh conflicting testimony and make determinations of credibility, crediting some, all or none of any given witness' testimony." (Internal quotation marks omitted.) *State* v. *Kendrick*, 314 Conn.

212, 223, 100 A.3d 821 (2014).[11] The jury could have believed portions of testimony from each of these two witnesses. Therefore, we cannot accept the defendant's claim that Thomas' testimony was wholly rejected by the jury and only Richard's testimony supported the jury's verdict. Instead, we conclude that the jury was free to believe those portions of each witness' testimony that it found credible. It is also clear to us that portions of both Thomas' and Richard's testimony supported the verdict.

In sum, even without considering Terror's statement regarding the details of what happened inside the victim's vehicle, the state's case consisted of testimony from two witnesses that not only corroborated, but also was cumulative of the challenged statement implicating the defendant as the killer. The defendant performed extensive cross-examinations of the state's witnesses highlighting inconsistencies in their testimony. The jury was free to make its credibility determination, and we do not second-guess that determination.[12]

The dissent also asserts that "deference to the fact finder is most appropriate when an 'assessment of the credibility of the witnesses . . . is made on the basis of its firsthand observation of their conduct, demeanor and attitude.' . . . Here, however, the evidence undermining the witness' credibility—namely, various forms of self-interest, including the desire to lessen or eliminate their criminal liability—is apparent not from subjective firsthand observation, but objectively from the transcript and exhibits offered by the parties." (Citation omitted; emphasis omitted.) We disagree. It is axiomatic that "[w]e do not sit as a thirteenth juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . Rather, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *State v. Bush*, 325 Conn. 272, 304–305, 157 A.3d 586 (2017). Importantly, the jury heard and evaluated all of the objective evidence offered to impeach the witnesses. It also observed firsthand each of the witness' conduct, demeanor, and attitude upon being confronted with that impeachment evidence. The jury was free to make its credibility determination on the basis of what it heard in testimony and observed from watching the witnesses testify. The fact that the transcript and exhibits reveal biases and motives of the witnesses does not allow us to substitute our judgment of witness credibility for the jury's determination. As aptly stated by the trial court, "[t]here is nothing before [the court] that would indicate that the jury did anything other than conscientiously review the evidence and credit the testimony of . . . Thomas . . . and Richard, and [determine] that the state has proved [the defendant's] guilt beyond a reasonable doubt."

On the basis of the foregoing, even if we assume that the trial court incorrectly admitted the evidence under the coconspirator hearsay exception, the defendant has not met his burden of demonstrating that the admission of Richard's testimony regarding Terror's statement had a substantial impact on the jury's verdict. We conclude, therefore, that we have a fair assurance that, under the circumstances of this case, the jury's verdict was not substantially affected by any such error. Thus, the alleged error was harmless.

## II

The defendant next claims that the trial court improperly admitted testimony of Tavaris Wylie regarding statements made to him by the victim in which the victim expressed fear of the gang. In particular, the defendant asserts that the trial court abused its discretion in admitting the victim's statements as state of mind evidence because they were irrelevant, misleading, and unfairly prejudicial.

The state counters that the trial court properly admitted the statements as evidence of the victim's state of mind. Specifically, it asserts that the victim's statements illustrated his deteriorating relationship with, and fear of, the Piru gang and, therefore, were relevant to the defendant's motive to kill the victim. We agree with the state.

The following additional facts and procedural history are relevant to our resolution of this claim. At trial, the defendant filed a motion in limine seeking to preclude Wylie from testifying about statements made by the victim in which the victim expressed fear of the Piru gang. At the hearing on the motion, both the state and the defendant agreed that the state intended to introduce Wylie's testimony regarding the victim's statements to show that the victim was fearful of the gang.

The defendant argued that Wylie's testimony regarding the victim's fear of the Piru gang should be precluded on the basis that it was not relevant and that it was inadmissible hearsay. In response to that argument, the trial court remarked: "Well there's the state of mind exception, right? I mean that he's fearful, that's state of mind, right? But the state of mind only comes in if it's relevant." Rather than explain why the statements failed to satisfy the state of mind exception, or that the statements could not be considered admissible as nonhearsay,[13] the defendant focused his argument on challenging the relevance of the statements. He argued that the victim's fear of the gang was irrelevant and prejudicial because fear of the gang in general does not help to identify the defendant as the shooter.

After hearing the defendant's argument, the court asked the prosecutor if he wanted to be heard on the relevance issue. The prosecutor confirmed that he was offering Wylie's testimony as state of mind evidence—

although he did not specify whether he was offering it as an exception to the hearsay rule or as nonhearsay—and that it was relevant because it demonstrated that the victim had specific concerns about the Piru gang, his relationship with the gang, and the gang's behaviors toward him.

The trial court ruled as follows: "Well, here's my ruling. You know, there's an interesting case, [*State* v. *Duntz*, 223 Conn. 207, 613 A.2d 224 (1992), in which] the Supreme Court ruled it inadmissible, the statement of a victim, that—I think it was a woman—that she feared the defendant, and that, without more, isn't probative of—or isn't relevant and isn't probative of anything. But then there's a subsequent case, [*State* v. *Patterson*, 276 Conn. 452, 886 A.2d 777 (2005)] while recognizing *Duntz*, distinguished it in that case, because . . . the statements regarding fear were circumstantial evidence of a deteriorating relationship. I think that's similar here. I think it's relevant for two reasons. One, is it potentially corroborates . . . Thomas' testimony that he told [the victim] that the gang was going to kill him, and, secondly, it shows the nature of the—or is probative of the nature of the deteriorating relationship between [the victim] and the gang. The state's claim here is the gang ordered this hit. So his relationship with the gang is certainly relevant, and whether it was deteriorating is certainly relevant, and his fear of the gang is evidence of that. So, for those reasons, the motion in limine is denied."

Wylie proceeded to testify that, on the night of the victim's death, he had a conversation with the victim during which the victim expressed his fear of the Piru gang. Wylie stated that he and the victim were discussing the gang when the victim said that he "just had a funny vibe about everybody." He further stated that the victim "felt like they [were] rocking him to sleep." Wylie explained that "rocking him to sleep" meant that they were "sheep in wool's clothing"[14] and that they were "coming for you." The defendant declined to cross-examine Wylie.

We begin by setting forth the standard of review and legal principles applicable to this claim. "To the extent [that] a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review is plenary." *State* v. *Saucier*, 283 Conn. 207, 218–19, 926 A.2d 633 (2007). "We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion. . . . [O]nly after a trial court has made the legal determination that a particular statement is or is not hearsay, or is subject to a hearsay exception, is it vested with the discretion to admit or to bar the evidence based upon relevancy, prejudice, or other legally appropriate grounds related to the rule of evidence under which admission is being sought." (Citation omitted.) Id.

"It is axiomatic that [if premised on a correct view of the law, the] trial court's ruling on the admissibility of evidence is entitled to great deference. . . . In this regard, the trial court is vested with wide discretion in determining the admissibility of evidence . . . . Accordingly, [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Furthermore, [i]n determining whether there has been an abuse of discretion, every reasonable presumption should be made in favor of the correctness of the trial court's ruling, and we will upset that ruling only for a manifest abuse of discretion." (Internal quotation marks omitted.) *State* v. *Popeleski*, 291 Conn. 769, 774, 970 A.2d 108 (2009).

In the present case, the trial court did not clearly specify whether it was admitting Wylie's testimony regarding the victim's statements of fear as hearsay satisfying the state of mind exception or as nonhearsay. In the trial court, neither the state nor the defendant challenged the trial court's legal determination regarding whether the statements satisfied the state of mind exception to the hearsay rule or were nonhearsay but, instead, focused on relevancy and prejudice.[15] Accordingly, we do not address the trial court's legal determination but examine only whether the trial court abused its discretion in determining that these statements were relevant.

"Evidence is relevant only if it has some tendency to establish the existence of a material fact." (Internal quotation marks omitted.) *State* v. *Duntz*, supra, 223 Conn. 233. "Whether the victim's state of mind is relevant depends . . . on the nature of the issues at trial. . . . We previously have held that evidence of a victim's mental state may be relevant to establish the defendant's motive to kill the victim." (Citation omitted; internal quotation marks omitted.) *State* v. *Patterson*, supra, 276 Conn. 485–86; see also *State* v. *Hull*, 210 Conn. 481, 502, 556 A.2d 154 (1989) ("[t]he victim's mental state was relevant both to show the victim's fear of the defendant . . . and to establish the defendant's motive for committing the crime").

In order for a victim's fear of the defendant to be relevant to motive, the state must demonstrate (1) a preexisting relationship between the victim and the defendant, and (2) independent evidence corroborating the victim's fear. As to the first requirement, "[i]t is well established in our jurisprudence that, where a marital or romantic relationship existed between a homicide victim and the defendant, evidence of the victim's fear of the defendant suggests a deterioration of that relationship, which is relevant to the issues of motive and intent. . . . This view finds support in the case law of multiple jurisdictions as well as common experience." (Citations omitted.) *State* v. *Smith*, 275 Conn. 205, 217,

881 A.2d 160 (2005). We have also applied this rule, however, to encompass other preexisting relationships between the victim and the defendant that are not marital or romantic in nature. See *State* v. *Patterson*, supra, 276 Conn. 485–86 (concluding that trial court did not abuse its discretion by admitting evidence of victim's fear of group of people that included defendant to demonstrate motive); cf. E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 8.16.2 (b), p. 561 (cautioning that, "[u]nless there was a [preexisting] relationship . . . between the declarant and the defendant, bald statements that the declarant feared the defendant should not be admitted to prove the defendant was the cause of that fear").

With respect to the second requirement, this court also consistently has required that the state present independent evidence of the victim's fear in order for a victim's out-of-court statement of fear to be admissible. For instance, in *State* v. *Duntz*, supra, 223 Conn. 233, this court concluded that the trial court had abused its discretion in admitting statements of the victim's fear of the defendant to establish the defendant's motive when the only evidence of the victim's fear was the victim's uncorroborated statements to other people that he was in fear. In *Duntz*, the state asserted that the victim's alleged fear of the defendant was relevant because it showed that the victim and the defendant did not have a good relationship which, in turn, showed that the defendant had a motive to kill the victim. Id.

This court explained that "the jury could not have drawn such an inference *solely from the statements of the victim* without resorting to impermissible speculation. Indeed, the victim's expressed fear may have been subjective and unfounded. Particularly in view of the tremendous potential for this evidence of subjective fear to prejudice the defendant unfairly, we conclude that it was not admissible under the state of mind exception to the hearsay rule." (Emphasis added.) Id.

Subsequently, in *State* v. *Patterson*, supra, 276 Conn. 487, this court concluded that the trial court did not abuse its discretion in admitting out-of-court statements of the victim's fear of the defendant. Unlike in *Duntz*, however, in *Patterson*, there was independent evidence corroborating the victim's fear in the form of testimony from another witness about the deteriorating relationship between the victim and the defendant. Id. On that basis, this court distinguished *Duntz* and explained that, "in light of . . . corroborative testimony, the trial court reasonably determined that [the witness'] testimony regarding the victim's state of mind shortly before his death was probative of the defendant's motive to kill the victim." Id. This court further explained that, because of the independent evidence, "the jury was not required to draw an inference of motive solely on the basis of the victim's uncorroborated statement." Id.;

see also *State* v. *Wargo*, 255 Conn. 113, 139, 763 A.2d 1 (2000) ("[T]he state adduced ample evidence tending to show that the defendant had decided to kill the victim because he was extremely angry and upset that she had intended to divorce him and that, consequently, his contact with his children would be limited. We, therefore, conclude that the trial court did not abuse its discretion in determining that the testimony evidencing the victim's state of mind was relevant to establish, circumstantially, the extent to which the defendant's marriage had broken down, a state of affairs that the jury reasonably could have determined provided the defendant with a motive to kill the victim." [Footnote omitted.]).

Accordingly, in order to determine whether the trial court abused its discretion in determining that the victim's statements expressing fear of the gang, and thereby the defendant, were relevant, we must consider whether the state demonstrated that the defendant and the victim had a preexisting relationship and whether the state presented independent evidence to corroborate the victim's fear.[16] We conclude that it has.

This case is controlled by our decision in *State* v. *Patterson*, supra, 276 Conn. 484–89. In *Patterson*, the defendant challenged the trial court's admission of testimony regarding certain statements made by the victim shortly before his death in which he expressed fear of a group of people that he knew. Id., 484. The defendant was a part of that group. The victim believed that this group was blaming him for shooting their mutual friend, Aki Johnson. Id., 455, 484–85. The victim's statement that was at issue was " 'they're trying to put this thing about [Johnson] on [me].' " Id., 456. The defendant argued that the victim's statement was vague and ambiguous with respect to the identity of those who, in the victim's view, blamed him for shooting Johnson. Id., 487. This court concluded that the victim's statement of fear was relevant because the state had presented independent evidence in the form of testimony of another witness corroborating the victim's fear. Id. Specifically, in *Patterson*, the state presented another witness who testified that the group, which included the defendant, had blamed the victim for shooting Johnson and that the defendant had killed the victim in retaliation for that shooting. Id.

Consequently, this court concluded that the jury was not required to draw an inference of motive solely on the basis of the victim's uncorroborated statement because the victim's fear was corroborated by other, independent evidence. Id. Accordingly, this court concluded that the trial court had not abused its discretion in finding that the state of mind evidence of the victim's fear was relevant because the jury could infer the defendant's motive, without impermissible speculation. Id. This court also concluded that, even though the victim

did not specifically identify the defendant as one of the persons who harbored the belief that the victim had shot Johnson, his reference to the group of people, which included the defendant, who harbored that belief, was a sufficient link between the victim's statement and the defendant to warrant the admissibility of the victim's statement. Id.

We find *Patterson* particularly instructive on two points. First, *Patterson* teaches that the victim's statements reflecting fear of the defendant will be considered sufficiently probative if the state presents corroborating evidence of that fear.

In the present case, the state presented independent corroborating evidence of the victim's fear and the defendant's motive to kill the victim. In particular, starting with the evidence of a deteriorated relationship, Richard testified that members of the Piru gang felt the victim had disrespected them because they believed that he was planning on switching to a different gang. Thomas also testified that he knew that there were issues between members of the Piru gang and the victim. Thomas further testified that Terror had said that he wanted the victim "taken care of" and that the defendant then volunteered to kill the victim. From this testimony, which was independent and corroborative of the victim's statements to Wylie, the jury could infer that the victim's relationship with the gang had deteriorated and, thus, the defendant had a motive to kill the victim.

Furthermore, Thomas testified about the hierarchical structure of the Piru gang and how lower gang members, like the defendant and Thomas, were expected to rise up in the ranks. Indeed, the testimony offered at trial indicates that following orders to kill was a way to rise up in the ranks. Thomas also stated that, shortly after the defendant volunteered to kill the victim, Thomas made the victim aware of the threat that had been made on his life. Accordingly, we conclude that, as in *Patterson*, the existence of independent, corroborating evidence allowed the jury in the present case to infer motive from the victim's expression of fear without resorting to impermissible speculation.

Second, *Patterson* also instructs that the victim's statement of fear of the group, of which the defendant was a member, was admissible even though the victim did not identify the defendant specifically. In the present case, the victim's statement of fear related to a group to which the defendant belonged, although he did not identify the defendant specifically. The evidence demonstrated that the leader of the gang wanted the victim dead and that the defendant was not only a member of the gang but also had volunteered to commit the killing. We conclude, consistent with *Patterson*, that the victim's statement of fear of the Piru gang provided a sufficient link to the defendant to warrant the admissibility of the victim's statements.

The defendant asserts that the trial court abused its discretion in admitting the statements regarding the victim's fear of the Piru gang because the victim's state of mind was not relevant. He argues that the victim's state of mind was not relevant because (1) Thomas' testimony was not corroborative because the defendant asserts that Thomas' testimony was not credible and did not identify the defendant as the person the victim feared, and, relatedly, (2) the actual statement of the victim's fear itself did not address the victim's relationship with the defendant specifically but only related to the gang as a whole. In support of his claim, the defendant relies on *State* v. *Duntz*, supra, 223 Conn. 232–33. Specifically, the defendant asserts that *Duntz*, rather than *Patterson*, controls the outcome of the present case. We disagree.

In *Duntz*, this court concluded that statements by a victim regarding his fear of the defendant were inadmissible as state of mind evidence because the state presented no other evidence indicating that the victim and the defendant had an antagonistic relationship. Id., 233. This court explained that "the jury could not have drawn such an inference [that an antagonistic relationship and, hence, a motive existed] solely from the statements of the victim without resorting to impermissible speculation." Id. The sole evidence of motive was the victim's expressions of fear.

Neither of the defendant's arguments has merit. The present case does not involve a situation in which the victim's expressions of fear constituted the only evidence of his deteriorating relationship with the gang and, therefore, motive. To the contrary, the testimony of Thomas that the leader of the gang wanted him dead and that the defendant had volunteered to kill him is independent evidence corroborating the victim's fear. That type of evidence did not exist in *Duntz*. Thus, we find *Duntz* inapplicable to the present case.

Additionally, the defendant's argument that Thomas' testimony is not corroborative because it does not specifically identify the defendant as the person the victim fears must also fail. Again, as we pointed out in *Patterson*, fear of a group that includes the defendant may serve as a sufficient link even if the victim does not identify the defendant specifically. See *State* v. *Patterson*, supra, 276 Conn. 487. Because there was sufficient, independent evidence corroborative of the defendant's fear, we conclude that *Patterson* controls the outcome of this case, not *Duntz*.

To the extent that the defendant asserts that there is no corroborating evidence in the present case because Thomas' testimony was not credible, we cannot review that claim. As we have explained previously in this opinion, "[q]uestions of whether to believe or to disbelieve a competent witness are beyond our review. As

a reviewing court, we may not retry the case or pass on the credibility of witnesses. . . . We must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *State* v. *Kendrick*, supra, 314 Conn. 223. It is not our role to question whether the jury believed Thomas' testimony. The fact is that, if believed, Thomas' testimony provided independent evidence corroborating the victim's fear of the gang. Our inquiry must end there.

The defendant finally argues that the trial court abused its discretion in admitting the state of mind evidence because the evidence was unduly prejudicial. We disagree. As this court recognized in *State* v. *Duntz*, supra, 223 Conn. 233, state of mind evidence has the potential to unfairly prejudice a defendant. Nevertheless, this court consistently has concluded that a trial court does not abuse its discretion when it admits state of mind evidence of the victim's fear as long as the state has demonstrated a preexisting relationship between the defendant and the victim and has produced independent, corroborating evidence of the victim's fear. As we have explained in this opinion, in the present case, the state both demonstrated a preexisting relationship between the victim and the defendant and produced independent evidence to corroborate the victim's fear.

Accordingly, we conclude that the trial court did not abuse its discretion in determining that the victim's state of mind was relevant as evidence of the deteriorating nature of his relationship with the Piru gang from which the jury could reasonably infer the defendant's motive to kill him.

The judgment is affirmed.

In this opinion ROBINSON, C. J., and McDONALD and KAHN, Js., concurred.

[1] The state also charged the defendant with criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1) and carrying a pistol without a permit in violation of General Statutes § 29-35 (a). The defendant elected to be tried by the court on these charges, and the court acquitted him on both.

[2] We note that the defendant does not claim that the admission of evidence violated any of his constitutional rights. Therefore, we review his claims solely for evidentiary error.

[3] Thomas explained that the Piru gang has a hierarchical structure and that, if a lower ranking member does not follow the orders of a higher ranking member, the hood enforcer is the member that has the duty of imposing discipline on the lower ranking member. He also testified that, as newer members of the Piru gang, both he and the defendant were expected to try to rise up in ranks of the gang. One way to rise up in the ranks was following orders to kill. At the time of Terror's order, Thomas had been a member of the Piru gang for six or seven months.

[4] We note that Richard's name is spelled incorrectly in various written motions and transcripts. We refer to him as Richard because that spelling is consistent with the manner in which he identified himself at trial.

[5] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3).

[6] The dissent contends that the credibility of Thomas and Richards "was

subject to significant challenge" and that Terror's statements were "critical corroboration" evidence that improperly bolstered their credibility. We disagree. Terror's statement was introduced through Richard. Terror did not testify. Therefore, if the jury believed Terror's statement, they must have found Richard credible in relaying it, and, therefore, it was not needed to bolster his testimony. Rather, if the statement regarding Terror was believed, it was because the jury found Richard credible on this point. As to Thomas, to the extent that Terror's statement could have bolstered the testimony of Thomas with respect to the fact that the defendant confessed to killing the victim, as we have explained in this opinion, Terror's statement was not critical but, instead, was simply cumulative of other evidence that corroborated that portion of Thomas' testimony.

[7] We note that part II B of the dissenting opinion recognizes and relies in its analysis upon the fact that Terror's statements offered very little new information in comparison to what Richard already knew, yet part I of the dissenting opinion asserts that Terror's statements "played a prominent part in the case against the defendant." We think that the dissent's characterization of Terror's statements as providing little additional information is correct and, thus, conclude that the admission of evidence regarding those statements was harmless.

[8] Although the state mentioned that the defendant killed the victim by "pointing a gun at the back of [the victim's] head and pulling the trigger and putting a bullet through the back of his skull," the state never attributed this evidence to Terror, and that evidence was also supported by the forensic evidence demonstrating that the victim was shot on the back, right side of the head.

[9] As one basis to support this claim, the defendant argues that the trial court's acquittal on the other related charges; see footnote 1 of this opinion; is an indication that the state's case was weak. The state, however, accurately points out that the trial court, in rejecting the defendant's posttrial motion for a judgment of acquittal, explained that "clearly, there was evidence that, if credited by the jury, [the defendant] was guilty of the two crimes for which he was found guilty. . . . There is nothing before [the court] that would indicate that the jury did anything other than conscientiously review the evidence and credit the testimony of . . . Thomas . . . and Richard, and [determine] that the state has proved [the defendant's] guilt beyond a reasonable doubt." For these reasons, we cannot conclude that the state's case was weak on the basis of the judgment of the trial court regarding the related charges.

The dissent also relies upon the trial court's acquittal in its analysis. We disagree that the trial court's view on separate charges that were part of a bench trial should be considered in our analysis of the issues in this case. The defendant exercised his constitutional right to have the jury be the ultimate fact finder in this case and, like the trial court correctly recognized, that is the fact finder to whose judgment we defer in evaluating the credibility of the state's witnesses.

[10] As we explained previously in this opinion, Thomas testified that, on the day of the murder, he attended a meeting at Youmans' house and that, at that meeting, Terror ordered Thomas to kill the victim, Thomas refused, and the defendant volunteered to do it. Thomas also testified that this meeting took place "later on in the day." Thomas testified that he, Youmans, Terror, Richard, and the defendant were present at the meeting. Thomas further stated that "I believe there might have been more, but I just don't remember who."

Richard testified that, on the day of the murder, he attended a meeting at Youmans' house where the individuals present were "discussing" the victim. He further testified that the meeting took place at "10:30, 11 in the morning." He stated that he, Youmans, Terror, and "a couple of . . . other members" were present but that he could not "remember everybody's name who was there." He also stated that the defendant was not present.

At first glance, the testimony of Thomas and Richard regarding the meeting seem to conflict. We are, however, not convinced that their testimonies are irreconcilable. It is entirely possible that there were two meetings and Thomas could have been mistaken that Richard was present at the meeting he attended, particularly given his own admission that he could not remember everyone who was present at the meeting.

[11] In the present case, the members of the jury were instructed in relevant part: "You are also not bound to accept a fact as true simply because a witness testifies to a fact and no one contradicts it. The credibility of the witness and the truth of the fact is for you to determine. You may disbelieve

all or any part of a witness' testimony. . . . You should decide what portion, all, some, or none of a witness' testimony you will believe."

[12] The dissent asserts that, "[a]lthough for some issues raised on appeal, we must defer to the jury's credibility determinations, our cases make clear that we may consider witness credibility in a harmless error analysis," and cites several cases in support of that position. To the extent that the dissent asserts that we do not defer to the credibility determinations of the fact finder, we disagree and find the dissent's reliance on the cases misplaced. The cases cited by the dissent do not demonstrate that we do not defer to the fact finder's credibility determinations. Instead, the cases cited by the dissent address impeachment evidence of which the jury was unaware, not corroborating evidence. See *State* v. *Ritrovato*, 280 Conn. 36, 57–58, 905 A.2d 1079 (2006) (concluding that exclusion of impeachment evidence of alleged victim's prior sexual conduct rebutting her testimony that she was a virgin was not harmless error with respect to sexual assault charges); *State* v. *Cortes*, 276 Conn. 241, 885 A.2d 153 (2005) (concluding that exclusion of evidence of sexual relationship between complainant and defendant was not harmless error when presenting such evidence was "the most effective method of impeaching the state's witnesses"). Therefore, we find those cases to be inapposite.

In the present case, defense counsel performed extensive and thorough cross-examinations of Richard and Thomas, emphasizing for the jury the witnesses' potential biases and motivations for testifying. Unlike the juries in the cases cited by the dissent, the jury in the present case was fully informed and was not deprived of critical evidence regarding the witnesses' credibility.

The dissent relies on *Holmes* v. *South Carolina*, 547 U.S. 319, 330, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006), for the proposition that "where the credibility of the prosecution's witnesses or the reliability of its evidence is not conceded, the strength of the prosecution's case cannot be assessed without making the sort of factual findings that have traditionally been reserved for the trier of fact and that the South Carolina courts did not purport to make in this case." The principle annunciated in *Holmes* is not applicable here. *Holmes* does not involve a harmless error analysis.

In *Holmes*, the United States Supreme Court was examining South Carolina's evidentiary rule that evidence of third-party culpability may be ruled inadmissible at trial "where there is strong evidence of [a defendant's] guilt, especially where there is strong forensic evidence." Id., 324. The United States Supreme Court rejected South Carolina's evidentiary rule, in part, because it did not require the trial court to consider the credibility of the prosecution's witnesses or the reliability of its evidence before deciding whether to exclude third-party culpability evidence during the course of the trial, i.e. before a jury has made any credibility determinations itself. This is wholly different from allowing an appellate court to substitute its judgment for the fact finder after the fact finder has made its credibility determinations, which is what the dissent is suggesting we should do here.

[13] We note that out-of-court statements demonstrating the defendant's state of mind can be admissible (1) as nonhearsay when they are not offered to prove the truth of the matter asserted; see *State* v. *Wargo*, 255 Conn. 113, 138, 763 A.2d 1 (2000); or (2) under the state of mind exception to the hearsay rule. See *State* v. *Smith*, 275 Conn. 205, 219–20, 881 A.2d 160 (2005).

[14] Presumably, Wylie meant that the gang members were "wolves in sheep's clothing."

[15] Although the defendant refers to the victim's statements as inadmissible hearsay in his brief, he does not assert that the trial court made an incorrect legal determination that they fit within the state of mind exception to the hearsay rule or were nonhearsay. For its part, the state, although it asserts that the statements were nonhearsay, does not engage in an analysis of the trial court's legal determination because, as the state points out, the defendant has not argued that the court had an incorrect view of the law. The defendant focuses solely on whether the trial court abused its discretion in admitting the statements because they were not relevant and were unduly prejudicial given that the victim's fear was of the gang generally and not of him specifically. Accordingly, because the defendant does not adequately challenge whether the trial court's decision was premised on a correct view of the law, i.e., whether the statements were hearsay but satisfied the state of mind exception or were nonhearsay, we need not review that issue.

Therefore, our examination—like the parties' briefs—focuses on whether the trial court abused its discretion in determining that the statements were relevant. The relevancy determination is the same regardless of whether

statements of the victim's fear of the defendant were admitted under the state of mind exception to the hearsay rule or as nonhearsay. Compare *State* v. *Smith*, 275 Conn. 205, 217–20, 881 A.2d 160 (2005) (concluding that statements of victim's fear of defendant admitted under state of mind exception to hearsay rule are relevant to issues of defendant's motive and intent where there was corroborative evidence of victim's fear), and *State* v. *Duntz*, supra, 223 Conn. 233 (concluding that hearsay statements regarding victim's state of mind were not relevant to defendant's motive to kill victim where there was no corroborative evidence of victim's fear), with *State* v. *Patterson*, supra, 276 Conn. 487 (concluding that nonhearsay statements regarding victim's state of mind were relevant to defendant's motive to kill victim where there was corroborative evidence of victim's fear), and *State* v. *Wargo*, 255 Conn. 113, 138–40, 139, 763 A.2d 1 (2000) (concluding that nonhearsay statements regarding victim's state of mind were relevant to establish defendant's motive to kill where there was corroborative evidence of victim's fear).

[16] In the present case, the defendant does not challenge whether the state has demonstrated that he and the victim had a preexisting relationship. The evidence established that the defendant and the victim were closely connected through their membership in the Piru gang.

————————————————